UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ENCORE RECEIVABLE | : | Case No. 1:12-cv-297 |
| MANAGEMENT, INC., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| ACE PROPERTY AND CASUALTY | : | |
| INSURANCE COMPANY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING PLAINTIFFS' CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT (Doc. 66)**

This civil action is before the Court on Plaintiffs' cross-motion for partial

summary judgment (Doc. 66)[1] and the parties' responsive memoranda (Docs. 82, 111,

112, 115, 116, 118, 122, 136, 137).[2] The Court heard extensive oral argument on

June 11, 2012.

## I. BACKGROUND FACTS AND PROCEDURAL POSTURE

Plaintiffs commenced this action seeking a declaration of insurance coverage in

connection with two lawsuits, one captioned *Wheelock v. Hyundai Motor America, et al.,*

---

[1] Plaintiffs include Encore Receivable Management, Inc. ("Encore") and Convergys Customer
Management Group, Inc. ("CMG") (collectively "Plaintiffs").

[2] While the motion for summary judgment was filed as against Ace Property & Casualty
Company ("ACE"), additional Defendants Federal Insurance Company ("Federal"), Discover
Property and Casualty Insurance Company ("Discover"), St. Paul Fire and Marine Insurance
Company ("St. Paul"), American Home Assurance Company ("American Home"), and
American Guarantee & Liability Insurance Company ("American Guarantee") join in opposing
the motion.

No. 30-2011-00522293 (Superior Ct. Cal. Nov. 14, 2011) (the "Wheelock Action") and the other captioned *Knell v. Encore Receivable Management, Inc.*, No. 12cv426 (S.D. Cal. Feb. 16, 2012) (the "Knell Action").  Plaintiffs Convergys Customer Management Group Inc. ("CMG") and Encore Receivable Management, Inc. ("Encore") filed suit seeking coverage for the *Wheelock* and *Knell* Actions under four different commercial umbrella liability policies (the "Policies") issued by Defendant ACE.  Convergys bought primary, umbrella, and excess insurance coverage from the respective defendants.  (Doc. 1 at ¶¶ 16-20).

Primary policies were issued by Discover for October 1, 2005 to October 1, 2011, and by Old Republic Insurance Company ("Old Republic") for October 1, 2011 to October 1, 2012.  (*Id.* at ¶ 22).  The 2009-2012 primary policies contained an endorsement (the "Recording Exclusion") which modified coverage "to exclude liability arising from the recording of information or material in violation of law."  (*Id.* at ¶ 24).  Umbrella policies were issued by American Home for October 1, 2005 to October 1, 2008, and by ACE for October 1, 2008 to October 1, 2012.  (*Id.* at ¶ 23).  The umbrella policies did not have a "Recording Exclusion."  (*Id.* at ¶ 25).  Excess policies were issued by American Guarantee, Continental, Federal, and St. Paul for coverage of Convergys and its subsidiaries, including the plaintiffs Encore and CMG.  (*Id.* at  ¶ 26).

The *Knell* Action alleges that Encore operated a call center, and that Encore employees allegedly recorded various telephone conversations between Hyundai customers and Encore customer service representatives without obtaining the customers'

consent, and that these recordings were then distributed internally within Encore for training and quality control purposes.[3]  Similarly, the *Wheelock* Action alleges that Hyundai operated a call center and allegedly recorded various telephone conversations between Hyundai customers and Hyundai customer service representatives without obtaining the customers' consent.[4]

The "Insurance Coverage At Issue" is "the ACE Umbrella Policies."  (Doc. 66 at 15).  These policies state that ACE has a "duty to defend the 'insured' against any 'suit' seeking damages for… 'personal and advertising injury', even if groundless, false or fraudulent, to which this insurance applies… 3.  When damages sought for… 'personal and advertising injury' are not covered by 'underlying insurance' or any 'other

---

[3]  Knell specifically alleged that in February 2012, she initiated a confidential phone conversation with Encore employees or agents that was "recorded, monitored, and/or eavesdropped upon by Defendant" without consent.  (Knell Complaint at ¶¶ 9, 10).  Knell proposed to represent a class comprised of: "All persons in California whose inbound and outbound telephone conversations were monitored, recorded, eavesdropped upon and/or wiretapped without their consent by Defendant" within four years of the filing of the Complaint.  (*Id*. at ¶ 16).  The *Knell* matter was resolved in Encore's favor after the plaintiffs discovered that the phone number at issue was not registered to Encore.  (Corbett Dec., Ex. D).  Therefore, the only amounts at issue in the coverage action with respect to *Knell* are the costs of defense that Encore incurred prior to its dismissal.

[4]  The *Wheelock* action was filed not against Plaintiff CMG, but against its contractual partner, Hyundai, for which Hyundai has demanded defense and indemnification from CMG based upon the contract between the two.  Specifically, Hyundai makes that demand pursuant to an agreement, effective January 1, 2009, wherein CMG agreed to provide call center services to Hyundai and the parties agreed "to defend, indemnify and hold each other harmless to the extent held liable for certain alleged wrongful acts or omissions of the other."  (*Id*. at ¶¶ 34-35).  Specifically, *Wheelock* seeks to represent a class of plaintiffs comprised of "[a]ll persons located in California who, at any time during the applicable limitations period preceding the filing of this compliant through the date of resolution, participated in a telephone conversation with Hyundai customer service using a cellular or cordless telephone and whose calls with Hyundai customer service were recorded by Defendants without notice."  (Corbet Dec. at ¶ 21).

insurance', or any applicable self-insured retention has been exhausted by the payment of 'loss' covered by this policy." (*Id.* at 16).

Plaintiffs contend that the *Knell* and *Wheelock* Actions "are not covered by 'underlying insurance'" – that "[t]he primary policies purchased by Convergys to cover the 2009 to 2012 policy years each contain a 'Recording and Distribution of Material or Information in Violation of Law Exclusion' endorsement that excludes coverage for the *Knell* and *Wheelock* Actions because they constitute claims arising from the recording of information in violation of law", and that the Plaintiffs are "entitled to summary judgment holding that ACE has an immediate duty to defend" because "[t]he failure of ACE's arguments to support a dismissal of this action makes one additional fact crystal clear: the Actions are at least potentially covered under the terms of the ACE Policies." (Doc. 66 at 30). Plaintiffs argue that as long as there is a question of fact regarding whether the claims are covered, ACE must pay for Plaintiffs' defense as a matter of law because any question of fact serves only to confirm that the Underlying Actions at least "potentially" fall within the policy coverage.

Defendants maintain that Plaintiffs have provided no evidence, and have not pointed to any allegations in the *Wheelock* or *Knell* Actions, demonstrating that the recordings at issue in either of the lawsuits were distributed or shared with anyone besides Hyundai, Encore, or CMG employees. Defendants claim that in Ohio, "publication," which is the threshold trigger to coverage at issue here, requires

distribution of information to the public at large in the context of insurance policies covering "personal and advertising injuries."

Plaintiffs filed this action for damages against ACE and for declaratory judgment against the remaining Defendants. ACE moved to dismiss the complaint and the other defendants moved for judgment on the pleadings. Plaintiffs cross-moved for partial summary judgment to enforce ACE's duty to defend. The Court denied all of Defendants motions, but permitted the parties to submit additional briefing in connection with Plaintiffs' motion regarding ACE's duty to defend. Plaintiffs' motion for partial summary judgment is now ripe for resolution.[5]

## II. UNDISPUTED FACTS[6]

### The Knell Action

1. On or about February 16, 2012, Encore was sued in the United States District Court for the Southern District of California (the "*Knell* Action"). The *Knell* civil complaint alleges that on or about February 15, 2012, the underlying plaintiff called Encore, and that her conversation was recorded, which she did not know until she asked the Encore representative at the end of the call whether their conversation was being recorded and was told that it was. (Doc. 46, Ex. D at ¶ 9).

2. The complaint also alleges that Encore employed and/or caused to be employed certain equipment on the telephone lines of all of its employees, officers, directors and managers which it "utilized to overhear, record, and

---

[5]   The parties agreed to an initial stay of discovery pending a ruling on all pending motions or a settlement or final judgment in the *Wheelock* Action. (Doc. 77 at 1-2). To date, no settlement or final judgment has been reached in the *Wheelock* Action, and the Court has yet to rule on all pending motions. Thus, no discovery has been conducted to date.

[6]   *See* Docs. 71 and 83.

listen to each and every incoming and outgoing telephone conversation over said telephone lines."  (Doc. 46, Ex. D at ¶¶ 29-30).

3. The plaintiff claims that Encore violated her right of privacy by "eavesdropping" on calls, and asserts claims for: (1) violation of California Penal Code § 637.2, which prohibits, among other things, the recording of calls without notice to and the consent of the caller to the recording; (2) common law invasion of privacy; (3) negligence; and (4) violations of the California Business and Professions Code.  (*Id.* at ¶ 49; First, Second, Third and Fourth Claims for Relief).  In addition to injunctive relief, the complaint seeks as damages in connection with those claims: (1) the $5,000 per violation in statutory damages provided by California privacy law; (2) "general damages according to proof"; and (3) "special damages according to proof."  (*Id.* at Prayer for Relief).

**The Wheelock Action**

4. On or about November 14, 2011, a putative class action was filed in the Superior Court of the State of California (the "*Wheelock* Action").  The class action allegations of the *Wheelock* First Amended Complaint state that the action has been brought against Hyundai Motor America ("Hyundai"), along with DOES 1 through 10, on behalf of a putative class consisting of "[a]ll persons located in California who, at any time during the applicable limitations period preceding the filing of this complaint through the date of resolution, participated in a telephone conversation with Hyundai customer service using a cellular or cordless telephone and whose calls with Hyundai customer service were recorded by Defendants without notice."  (Doc. 46, Ex. C).

5. CMG operated a call center in Utah for Hyundai, at which it recorded certain calls for quality control purposes, from on or around January 1, 2006 to on or around March 2012.  (Doc. 67 at ¶ 2).

6. The agreements between CMG and Hyundai include a qualified obligation for each party to defend, indemnify and hold the other party harmless subject to the terms of the agreements.  (*Id.* at ¶ 3).

7. CMG employees, who were not participants on the recorded phone calls at issue in the *Wheelock* Action, subsequently listened to some of the phone calls for quality assurance and training purposes.  (*Id.* at ¶ 9).

8. Hyundai had access to the recordings and could request that the audio file for any call be forwarded to it at any time. (*Id.* at ¶ 8).

9. Hyundai employees also participated in meetings during which they listened to call recordings and evaluated the quality of the calls. (*Id.* at ¶ 7).

10. On or about November 23, 2011, after being sued in the *Wheelock* Action, Hyundai demanded that CMG defend, indemnify and hold Hyundai harmless, and assume Hyundai's defense of the *Wheelock* Action (the "Hyundai Demand"). (*Id.* at ¶ 10).

**The Insurance Coverage At Issue**

11. Convergys purchased the ACE Umbrella Policies in which ACE specifically promised to:
    Pay on behalf of the 'insured' those sums in excess of the 'retained limit' that the 'insured' becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies.
    (Doc. 46, Ex. A at § I.A).

12. "Personal and advertising injury" is expressly defined to include injury "arising out of" several types of offenses, including "oral or written publication, in any manner of material that violates a person's right of privacy." (*Id.* at §VII.R.5).

13. The term "publication" is not defined in the ACE Policies. (*Id.* at §VII.R.5).

14. The ACE Umbrella Policies also promise to provide Convergys and its subsidiaries with a defense to claims that potentially fall within the coverage of the policy, but which are not covered under the terms of the primary policies, stating that the insurer shall have the:
    duty to defend the 'insured' against any 'suit' seeking damages for . . . 'personal and advertising injury', even if groundless, false or fraudulent, to which this insurance applies: . . . 3. When damages sought for 'bodily injury', 'property damage' or 'personal and advertising injury' are not covered by 'underlying insurance' or any 'other insurance', or any applicable self-insured retention has been exhausted by the payment of 'loss' covered by this policy.
    (*Id.* at §III.A).

15. The "Unsolicited Communications" exclusion precludes coverage for liabilities arising out of communications "in which the recipient has not specifically requested the communication" and "to communications which are made or allegedly made in violation of . . . [a]ny statute, ordinance or regulation, other than the TCPA or CAN-Spam Act of 2003, which prohibits or limits the sending, transmitting, communicating or distribution of material or information." (*Id.* at § V.V.3).

16. The Criminal Acts exclusion precludes "'Personal and Advertising Injury' arising out of a criminal act committed by or at the direction of the 'insured." (*Id.* at § V.Q.4).

17. The ACE Policies define the "Products-completed operations hazard" as applicable to certain claims for "bodily injury" or "property damage" – but not "Personal and Advertising Injury" which is the injury for which Encore and CMG seek coverage. (*Id.* at § VII.T).

18. The primary policies purchased by Convergys to cover the 2009 to 2012 policy years each contain a "Recording and Distribution of Material or Information in Violation of Law Exclusion" endorsement that excludes coverage for claims arising from the recording of information or material in violation of law: This insurance does not apply to 'Personal and advertising injury' arising directly or indirectly out of any action or omission that violates or is alleged to violate . . . [a]ny federal, state or local statute, ordinance or regulation [other than certain irrelevant exceptions] that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information. (Doc. 68, Exs. 1-3 (Exclusion No. CG 00680509)) ("The Recording Exclusion")).

19. As a result of this Recording Exclusion, the primary policies do not provide coverage for the *Knell* and *Wheelock* Actions. (*Id.*)

20. The ACE Umbrella Policies contain no Recording Exclusion. (*See generally* Doc. 46, Ex. A).

**The Claims for Coverage**

21. On December 12, 2011, Convergys provided notice to ACE of the *Wheelock* Action. (Doc. 46 at 7).

22. On March 23, 2012, ACE denied Plaintiffs' claim. (Doc. 46 at 9).

### III.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

### IV.   CHOICE OF LAW

A federal court sitting in diversity in Ohio applies Ohio choice-of-law principles. *Borden, Inc. v. Affiliated FM Ins. Co*., 682 F. Supp. 927, 928 (S.D. Ohio 1987).  In insurance contract actions, Ohio follows the Restatement's test for determining which jurisdiction has the "most significant relationship to the transaction and the parties." *Ohayon v. Safeco Ins. Co.*, 747 N.E.2d 206, 209 (Ohio 2001).  In this analysis, Ohio "considers the place of the making, particularly the place of delivery and the place of

payment of the first premium as largely determinative of the law to be applied." *River Servs. Co. v. Hartford Accident & Indem. Co.*, 449 F. Supp. 622, 625 (N.D. Ohio 1977).[7]

Upon review of the relevant facts, Ohio law controls here to the extent there is a conflict between the laws of California and Ohio. California has no relationship to the contracts of insurance; it is merely the venue of the underlying *Knell* and *Wheelock* actions.[8]

## V.     ANALYSIS

### A. Threshold Issues

ACE maintains that there are two threshold issues the Court should consider before addressing the duty to defend.

#### 1.  *Whether CMG is an insured*

CMG is not expressly named as a party in the *Wheelock* complaint and therefore Defendants maintain it is not an insured. However, CMG is a Doe defendant in

---

[7]  Convergys is an Ohio corporation with its principal place of business in Ohio. The policies by the defendant insurers were all issued in Ohio. (Doc. 46, Ex. 1 at 1, 49, 101; Doc. 46-2 at 51). For example, Discover (located in Illinois) delivered its policies, which applied to "all [Convergys] locations," at its address in Cincinnati, Ohio (Doc. 115, Corbett Dec., Ex. F). St. Paul (located in Minnesota) also delivered its policies, which contain no location restriction, to Convergys in Ohio. (*Id.*, Ex. H). These factors afford Ohio the "most significant relationship." *River Servs.*, 449 F. Supp. at 625.

[8]  Plaintiffs concede that Ohio law potentially applies because the first named insured, Convergys, and Plaintiff CMG are each Ohio corporations with their principal places of business in Ohio; but Plaintiffs maintain that California law also potentially applies because each of the underlying lawsuits at issue was filed in California and allege, *inter alia*, California statutory violations. However, Plaintiffs maintain that because the substantive law of both Ohio and California are identical on all of the issues raised by this motion, the Court need not make any choice of law in connection with its resolution. *Anderson, Inc., v. Consol, Inc.*, 185 F. Supp. 2d 833, 836 (N.D. Ohio 2002).

*Wheelock*, which is supported by the fact that CMG is expressly defending the matter. While CMG does not appear on the record, counsel appears in court for hearings and are actively defending the case.  A defendant who is not expressly named in a complaint may still give rise to a duty to defend.  *See, e.g., Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 940-44 (Cal. Ct. App. 2006) (holding that there was a duty to defend where wife was not named in the complaint, but based on her actively defending the case, it was obvious that there was going to be the potential that she would be liable for coverage).

Accordingly, the Court finds that there is sufficient evidence at this stage in the litigation that CMG is an insured.

### 2.    *Applicable policy*

In Ohio, an insured prosecuting an insurance coverage action has the burden of establishing that coverage exists under a policy for a particular claim.  *Inland Rivers Serv. Corp v. Hartford Fire Ins. Co*, 418 N.E.2d 1381, 1382 (Ohio 1981).  Therefore, Plaintiffs have the burden of alleging facts sufficient to establish that their loss was within the scope of coverage of the 2009-2012 ACE Policies under which they seek coverage.  *State Farm Fire & Cas. Co. v. Hiermer*, 720 F. Supp. 1310, 1314 (S.D. Ohio 1988).

Plaintiffs fail to specify the policy under which they seek coverage for the *Knell* and *Wheelock* Actions and instead cite three different ACE policies spanning three different policy years.  Plaintiffs believe they are entitled to summary judgment under each of the three policies.  Plaintiffs decline to pick one specific policy because if there is a dispute of fact as to the class period in the underlying action, it may affect what policy

Plaintiffs choose. Thus, ACE claims Plaintiffs have failed to comply with their duty and, as a result, have failed to establish that they are entitled to coverage as a matter of law.

Regardless of whether there are questions of fact relating to which of the policies must pay or how much each policy must pay, Plaintiffs may seek their full defense costs from any of the ACE umbrella policies triggered for the three policy years between October 1, 2009 and October 1, 2012. "An insurer has an absolute duty to defend an action when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy, even in part and even if the allegations are groundless, false or fraudulent…Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the insurance-policy coverage." *City of Sharonville v. Am. Employers Ins. Co*., 846 N.E.2d 833, 837 (Ohio 2006).[9] Limiting an insurer's defense obligation for a partially covered claim would be irreconcilably inconsistent with Ohio's black letter law requiring an insurer to provide a full defense to a non-covered claim as long as the underlying complaint alleges one potentially covered claim.

When a continuous occurrence spans multiple policy periods, "the insured is entitled to secure coverage from a single policy of its choice that covers 'all sums' incurred as damages 'during the policy period,' subject to that policy's limit of coverage." *Goodyear Tire & Rubber Co v. Aetna Cas & Sur. Co*., 769 N.E.2d 835, 841

---

[9] *City of Sharonville* is a Section 1983 civil action against police officers who covered up a murder over many years with various acts in furtherance of the conspiracy. The court determined that the duty to defend is indivisible – as long as they can invoke the duty to defend against the given insurance policy, that duty is indivisible. *Id.*

(Ohio 2002). Therefore, Plaintiffs are entitled to seek their full indemnity for settlements or judgments and their costs of defense in both underlying actions from any of the three ACE umbrella policies triggered by those losses.

### B. ACE's duty to defend

Plaintiffs allege that ACE has an immediate duty to defend and pay the costs of defending the Actions. Specifically, an insurer whose policy includes a duty to defend must immediately undertake the defense of a potentially covered action until such time as it is able to establish as a matter of law that there is no possibility of coverage. *Grange Mut. Cas. Co. v. Rosko*, 767 N.E.2d 1225, 1230 (Ohio App. 2001). The fact that the insurer may ultimately have a defense to coverage does not relieve it of its obligation to pay defense costs as they are incurred until and unless it can establish the applicability of that defense as a matter of law and fact. *Motorists Mut. Ins. Co. v. Trainor,* 294 N.E.2d 874, 878 (Ohio 1973).[10]

Accordingly, an insurer may not defeat a motion for summary judgment on the duty to defend by establishing the existence of issues of disputed fact with respect to whether the claim is covered under the policy, or by asserting that only some of the alleged claims fall within the coverage of the policy. *Ins. Co. of Pa. v. Vimas Painting Co.*, No. 4:06cv1048, 2007 U.S. Dist. LEXIS 34401 (N.D. Ohio May 10, 2007). In

---

[10] *See also Ohio Gv't Risk Mgmt. Plan v. Harrison*, 874 N.E.2d 1155, 1160 (Ohio 2007) (holding that insurers owe a duty to defend if the allegations in the underlying complaint are "not clearly and indisputably outside of the contracted policy coverage.").

13

granting the policyholder a declaration of the duty to defend on a motion for summary judgment, the Court recognized:

> The allegations in this count of the complaint at a minimum potentially or arguably state a claim covered by the policy and thus Plaintiff has a duty to defend the entire lawsuit…Accordingly the Court DECLARES as a matter of law that Plaintiff has a duty to defend Defendant against all claims in the King case at this point because the second cause of action in the King Lawsuit potentially or arguably states a claim covered by the 'occurrence' or 'accident' portion of the policy.

*Id* at 26. If an issue of fact exists as to the question of coverage, the policy holder is entitled to summary judgment enforcing its right to a defense. In other words, the duty to defend is a broad scope. "Where the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." *Willoughby Hills v. Cincinnati Ins. Co*., 459 N.E.2d 555 (Ohio 1984).

### C. Personal and Advertising Injury

The ACE Policies provide that ACE has a duty to defend the insured against any "suit" seeking damages for a "personal and advertising injury." (Doc. 46-1 at 12, 60; Doc. 46-2 at 3, 60). "Personal and advertising injury" is defined in the ACE policies to mean: "Injury…arising out of …[o]ral or written publication, in any manner, of material that violates a person's right of privacy." (Doc. 46-1 at 26, 74; Doc. 46-2 at 17, 74).

14

ACE claims that it does not have a duty to defend the lawsuits because the records were not distributed outside Hyundai, Encore, and/or CMG, so there was no requisite "oral or written publication," required in order to establish a "personal and advertising injury" within the meaning of the ACE Policies.  (Doc. 46-1 at 26, 74; Doc. 46-2 at 17, 74).

Specifically, ACE maintains that "publication," as that term is used in the ACE Policies requires the distribution of information or news to the public.  *Motorists Mut. Ins. Co. v. Dandy-Jim, Inc*., 912 N.E.2d 659, 666 (Ohio App. 2009) (an insured's distribution to potential customers – *i.e.*, the public – of unsolicited advertisements via facsimile constitute "publication of material that violates a person's right of privacy" within the meaning of the insured's commercial general liability policy).[11]  ACE maintains that the plaintiffs in the underlying actions do not premise their claims upon any "oral or written publication" by the insured.[12]  Therefore, according to ACE, those

---

[11]   The term "publication" is not defined in the policy.  *See also Bowyer v. Hi-Lad, Inc.*, 609 S.E.2d 895, 912 (W.Va. 2004) ("The [] policy contains no definition of the word 'publication.' We find nothing in the policy indicating that the word publication necessarily means transmitting the intercepted communications to a third party, as is required of material in the defamation context.").

[12]  The *Knell* complaint notes that the complained-of conduct, which is alleged to violate the class members' right to privacy, consists of "recording," "monitoring," "eavesdropping," "wiretapping," "overhearing," and/or "listening to" telephone conversations with class members. (Knell Compl. at ¶¶ 7, 9, 11, 12, 13, 14, 16, 20).  The common questions in the complaint include "[w]hether Defendant's policy of recording, wiretapping, eavesdropping upon, and/or monitoring incoming and/or outgoing calls constitutes an invasion of privacy[.]"  (*Id.*)  The *Wheelock* complaint explains that the lawsuit "arises out of Defendants unlawful practice of recording calls to [Hyundai's] customer service line without first obtaining customer consent." (Wheelock Am. Compl. at ¶ 1).  Specifically, that the defendants' practice of "recording telephone conversations without caller consent" violates the California Penal Code § 630, *et seq.* (*Id.* at ¶ 2).

actions do not either arguably or actually seek damages because of injury arising out of the "personal and advertising injury" offense of "oral or written publication, in any manner, of material that violates a person's right of privacy."

### 1.   What is Publication

Defendants argue that eavesdropping is not an act of communication to the public, but rather an invasion of seclusion accomplished by a non-communicative act.  *See, e.g., Kimmel v. Goland*, 793 P.2d 524, 529 (Cal. 1990) (holding that the recording of confidential phone conversations could not be characterized as either a publication or broadcast of information and denominating "the invasion of privacy resulting from…eavesdropping" as "noncommunicative conduct").  "Implicit in the *Ribas* decision was the distinction between injury allegedly arising from communicative acts, *i.e.,* the attorney's testimony, and injury resulting from noncommunicative conduct, *i.e.,* the invasion of privacy resulting from the attorney's eavesdropping."  *Id.* at 529 (citing *Ribas v. Clark*, 38 Cal. 3d 355 (Cal. 1985)).  The court reiterated that "[h]ere park management seeks statutory damages under Penal Code section 637.2 not for injuries arising from the broadcast and publication of private conversations, but for the recording of them."  *Id.* *Kimmel* expressly found the nature of the conduct (non-consensual telephonic recording and eavesdropping) that is penalized by the California Penal Code sections at issue to be

noncommunicative" conduct that is distinct from the "broadcast and publication of private conversations." 793 P.2d at 528-29. [13]

While *Dandy Jim* has some language that references dictionary definitions of the word "publication" that include the concept of "to the public,"[14] *Dandy Jim* was not looking at whether right of privacy of seclusion claims were covered, because there was no secret that was disseminated or published in that case. Therefore, *Dandy Jim* does not address what constitutes a publication in the context of a secrecy claim. Moreover, *Dandy-Jim* illustrates that a "third party" requirement is not synonymous with a "to the public" requirement. One pertains to the identity of the recipient of the disclosure, while the other pertains to the breadth or scope of the disclosure. The "third party" portion of the *Dandy-Jim* decision holds merely that the insured's communication need not be made

---

[13] In *Kimmel,* an attorney made surreptitious recordings of the defendants' telephone conversations in anticipation of litigation, then argued that his actions were protected by the California litigation privilege. To deny applicability of the privilege, the court characterized his conduct as "noncommunicative" but did so *within the meaning of the privilege* – not within the meaning of an insurance policy or the California privacy statute. What potentially drove the decision, however, was the court's desire to condemn the conduct of the attorney: "Guided by oath, duty and obligation, the lawyer's path avoids the vices from which the virtuous abstain. Thus, it ill suits the profession to seek immunity for injuries inflicted while engaged in legal warfare under the protective tarpaulin of the privilege for 'judicial proceedings.'" *Id.* at 531. The *Kimmel* court's determination that the act of recording a conversation falls outside of the litigation privilege has no more limiting effect on the meaning of the undefined policy term "publication" than do the limited defamation definitions of that term rejected by the court in *Dandy-Jim.* That is particularly true given the fact that more than two decades after the *Kimmel* holding, California courts continue to recognize that the act of recording constitutes the dissemination of information to an unannounced third-party listener. *See,* e.g. *Kight v. Cashcall, Inc.,* 200 Cal. App. 4th 1377, 1389 (Cal. 2011).

[14] Any ambiguity in an undefined policy term must be construed in favor of coverage. *See, e.g., Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, 691 F.3d 821, 826 (6th Cir. 2012).

to a recipient other than the person whose privacy rights were allegedly violated (as in

defamation) in order for a "publication" to be found. *Id.* at 666. [15]

In contrast, *Lens Crafters Inc. v. Liberty Mut. Fire Ins. Co.,* No. 04-1001, 2005

U.S. Dist. LEXIS 47185, at *35-36 (N.D. Cal. Jan. 20, 2005), found that secret

information does not have to be widely disseminated in order to constitute publication.

The courts that have looked at recording in the secrecy context have all read publication

very broadly and held that a transmittal or a further dissemination of secret information

satisfies publication. The firsthand experience of the communication, the words, the

tone, and the cadence are all protected. When the firsthand aspect of the communication

is transmitted to the mechanical device, it constitutes publication -- dissemination of that

unique aspect of the conversation that the speaker no longer has the ability to control. [16]

Here, this Court need not find that the communications were actually disseminated to

---

[15] The insured in *Dandy-Jim* allegedly faxed unsolicited advertisements to multiple claimants for three years, and was sued for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.* 912 N.E.2d at 661-62. The insurer argued no "publication" occurred because "publication" requires disclosure to a third party and the fax communications "were sent directly to the claimants, not to any third person or parties." *Id.* at 666. The court disagreed, finding that "publication" does not mean "communicating the offending material to a third party." *Id.* However, the court went on to find that "faxed advertisements are an act of 'publication' in the ordinary sense of the word." The court considered court definitions of "publication," each of which indicated that "publication" involves a communication of information "to the public." *Id.* It found a "publication" was alleged because "[b]y faxing advertisements to the claimants, as alleged in the complaint, Dandy-Jim 'published' the advertisements by communicating information to the public and distributing copies of the advertisements to the public." *Id.*

[16] *See, e.g., Ribas v. Clark*, 38 Cal.3d 355 (Cal. 1985) ("[S]uch secret monitoring denies the speaker an important aspect of privacy of communication – the right to control the nature and extent of the firsthand dissemination of his statements.").

third parties, because the initial dissemination of the conversation constitutes a publication at the very moment that the conversation is disseminated or transmitted to the recording device.

Accordingly, this Court need not find that the recordings were disseminated to the public in order to find publication.[17]

### D. Prior Publication Exclusion

Next, ACE maintains that it does not have a duty to defend because the alleged "publication" of the allegedly unlawfully recorded telephone conversations first took place before the beginning of the ACE policy periods.[18]  The ACE Policies only apply to "personal and advertising injuries" if the offense causing the injury takes place during the "policy period."  (Doc. 46-1 at 10, 58; Doc. 46-2 at 1, 58).  All damages that arise from

---

[17] Even if Plaintiffs were required to prove that the recordings were disseminated to the public, they have done so.  In the *Knell* complaint there is an allegation that the recorded communications were listened to and eavesdropped on which is a clear allegation that there was further dissemination.  (*Id.* at ¶ 12).  Further, Mr. Hunsaker's affidavit maintains that the conversations at issue in the *Wheelock* action were, in fact, disclosed to both CMG and Hyundai employees who were not participants in the original calls.  (Hunsaker Aff. at ¶¶ 7-9).  Because the allegations in the *Wheelock* complaint state a claim which is potentially or arguably within the policy coverage – invasion of right of privacy – they are entitled to utilize "matters well outside the four corners of the pleadings" to establish the potential for coverage that triggers an insurer's duty to defend.  *City of Willoughby Hills*, 459 N.E.2d at 558.  The existence of the potential for coverage sufficient to warrant consideration of matters outside the pleadings undermines the notion that, based upon undisputed facts, Plaintiffs cannot state a claim for coverage.

[18] Plaintiffs claim that the publication of the unlawful records at issue in the *Wheelock* Action commenced on January 1, 2006 (Doc. 1 at ¶¶ 34, 36), over two years prior to the ACE policy periods which cover the period from October 1, 2008 to October 1, 2012.  (Docs. 46-1 and 46-2).  The publication of the recordings at issue in the *Knell* Action, which commenced on February 16, 2008 (Doc. 1 at ¶ 28-29; Doc. 46-5 at ¶ 16), also pre-dates the inception of the ACE Policies.

the same "publication" are considered to arise out of the same "occurrence," regardless of the frequency, repetition, or number of "publications," and regardless of the number of claimants. (Doc. 46-1 at 26, 74; Doc. 46-2 at 17, 74). The ACE Policies state that there is no coverage for "'[p]ersonal and advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the 'policy period'" (the "First Publication Exclusion"). (Doc. 46-1 at 18, 66; Doc. 46-2 at 9, 66). Courts have applied first (or prior) publication exclusions where the allegations contained in the underlying actions indicate that the publication of the allegedly injurious material first occurred before the beginning of the policy period. *Transp. Ins. Co v. Pa. Mfrs.' Ass'n Ins. Co*., 346 Fed. Appx. 862, 867 (3rd Cir. 2009).

The prior or first publication exclusion bars coverage only for personal or advertising injury arising out of publication "of material whose first publication took place before the beginning of the 'policy period.'" (Doc. 46, Ex. 1 at 176). However, here, each individual telephone call constituted new material – the caller's individual confidential information – published for the first time when it was recorded during the call. For example, the fact that Sally Smith's confidential information was published when recorded during a call made in 2006 is thus wholly irrelevant to the question of when John Doe's confidential information was first published by recording his call, because the two calls do not constitute publication of the same material. Therefore, claims by the putative class members in the underlying actions who first telephoned

Plaintiffs' call center after the commencement of the ACE coverage in 2008 are not subject to the prior publication exclusion.[19]

For example, in *Applied Bolting Tech. Prods., Inc. v. U.S. Fid. & Guar. Co*., 942 F. Supp. 1029 (E.D. Pa. 1996), the court held that "the only dispositive issue under this exclusion is whether the injurious advertisement was 'first published' prior to coverage." Moreover, the court in *Applied Bolting* focused precisely on the content of the pre and post-coverage publications, holding that the exclusion applied because the pre-coverage advertisements contained the same offending phrase as the post-coverage advertisement. *Id.* at 1036 (policyholder's advertisements and materials contained identical false claim that "all DTIs made to ASTM F959-94a" both before and after the policy period).[20]

---

[19] In the cases upon which Defendants rely (*see, e.g.*, *John Deere Ins. Co. v. Shamrock Indus., Inc*., 696 F. Supp. 434, 441 (D. Minn. 1988); *Ringler Assocs. Inc. v. Md. Cas. Co*., 80 Cal. App. 4th 1165, 1183 (Cal. Ct. App. 2000)), the policyholder made the same substantively false or slanderous statements or infringed the same trademark or patent both before and after the policy period.

[20] Similarly, in *Taco Bell Corp. v. Cont'l Cas. Co*., 388 F.3d 1069, 1072 (7th Cir. 2004), a design firm alleged that the policyholder, Taco Bell, had misappropriated its deal for an advertising campaign centered on a Chihuahua obsessed with Taco Bell food. The ad campaign first aired prior to the policy period, but the advertisements during the policy period added additional elements which the design firm claimed included separately infringing material. *Id.* at 1072-1073. The insurer, Zurich, argued that it was not obligated to provide Taco Bell with a defense, because the ad campaign as a whole began airing prior to the commencement of its policy, and the prior publication exclusion therefore barred coverage for the claim. Judge Posner rejected that argument:

> Zurich is wrong. Wrench's complaint alleges – and the duty of an insurance company to defend against a suit against its insured is determined by the allegations of the complaint in that suit rather than by what is actually proved… - that those later commercials appropriated not only the "basic idea" ("Psycho Chihuahua") but other ideas as well that are protected by Michigan's common law of misappropriation, like the idea of the Chihuahua's poking its head through a hole at the end

Where, as in the instant case, the underlying complaints would allow proof of publication of new material during the policy period, the insurer may not avoid its duty to defend simply because the publications were part of a "continuing course of conduct." *CNA Cas. of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598 (Cal Ct. App. 1986) (holding insurer under 1969 policy must defend despite prior publication exclusion where the underlying complaint "merely alleges that [the policyholder's] entire course of conduct commenced 'as early as 1966,'" but would allow proof of separate defamatory statements after 1969).

The prior publication exclusion only applies to the extent that the material is the same before and after.  Here, the material is a particular phone conversation and the material differed from conversation to conversation.  Moreover, the duty to defend expands to all liability in a given suit.[21]  The allegation here is that there is a class of people who made these calls and whose rights were violated.  Once the duty to defend is triggered, ACE has a duty to defend the entire suit, even presumably uncovered calls.[22]

---

> of the commercial….Who knows whether it's really protected by Michigan law…But that is not the issue.  The charge of misappropriation of the idea of the Chihuahua's head popping out of a hole is a claim of advertising injury, meritorious or not; and Taco Bell bought insurance against having to pay the entire expense of defending against such claims.

*Id.* at 1073.

[21] Obviously, to the extent ACE is entitled to seek contributions from other carriers, it may do so.

[22] For example, there is some possibility that an individual's telephone call was reordered in 2008 or 2009, during ACE's policy period, but that s/he did not discover it until 2010 or 2012.  ACE must defend against all of the claims.

Therefore, because ACE cannot establish that the claims alleged in the underlying actions fall solely and exclusively within the scope of the prior publication exclusion, it does not apply at this stage in the litigation.

### E.  Professional Services Exclusion

Next, ACE claims that it has no duty to defend because the alleged "personal and advertising injuries" at issue arise out of the provision of professional services and there is no coverage under the ACE Policies for "personal and advertising injury' arising out of the providing of or failing to provide any services of a professional nature."  (Doc. 46-1 at 44, 94; Doc. 46-2 at 41, 90).

The policies do not define "services of a professional nature," or the word "professional."  Under black letter Ohio law, an undefined exclusionary term must be narrowly construed against the insurer.  *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988).  Ohio courts have long held that an exclusion for liabilities arising out of the provision of professional service cannot be broadened or morphed into a general exclusion for all liabilities arising out of the policyholder's work.

Plaintiffs' business – the operation of customer call centers on behalf of its clients – does not constitute "professional services" like those performed by lawyers or doctors to which courts apply the exclusion.  *See, e.g., Cincinnati Ins. Co. v. Am. Line Builders Apprenticeship Training Program*, 638 N.E.2d 1047, 1049 (Ohio App. 1994) (exclusion did not bar coverage for claims arising from the electrocution of a student in a trade school while under the supervision of a school instructor because "[t]o include teachers,

23

educational-type professionals, or linesmen in the policy's definition of 'professional' would amount to the construction of an ambiguous term liberally in favor of [the insurer], which is not justified in this case."). Thus, Defendants' broad interpretation of the undefined term "professional services" is inconsistent with Ohio precedent.

Accordingly, the professional services exclusion is inapplicable.

## F. Contractual Liability Exclusion

ACE maintains that it does not have a duty to defend Hyundai in the *Wheelock Action* because Hyundai is not an insured under the ACE Policies. (Doc. 46-1 at 1, 49, 101; Doc. 46-2 at 51). ACE argues that CMG bases its claims against it on an agreement that CMG entered into with Hyundai under which CMG agreed to defend and indemnify Hyundai for certain of CMG's wrongful acts or omissions for which Hyundai may be held liable. (Doc. 1 at ¶¶ 34-35). This is exactly was ACE claims its Contractual Liability Exclusion was designed to exclude. Pursuant to that exclusion, there is no coverage under the ACE Policies for "personal and advertising injury" for which an insured has assumed liability in a contract or agreement. (Doc. 46-1 at 18, 66; Doc. 46-2 at 9, 66). The agreement between CMG and Hyndai is an agreement by which CMG agreed to assume Hyundai's liability. (Doc. 1 at ¶ 34) ("Pursuant to an agreement effective January 1, 2009 (the "Agreement"), CMG provided call center services to Hyundai, including but not limited to the recording of certain calls for quality control purposes, from on or around January 1, 2006 to in or around March 2012. In the

Agreements, the parties each agreed to defend, indemnify and hold each other harmless to the extent held liable for certain alleged wrongful acts or omissions of the other.").

In *Burlington Ins Co. v. PMI Am., Inc*., 862 F. Supp. 2d 719, 738-739 (S.D. Ohio 2012), the Court recognized that contractual liability exclusions like in the ACE Policies are designed to exclude coverage – when the insured assumes liability through a hold harmless or indemnification agreement. "Liability insurance policies not infrequently contain provisions specifically excluding from coverage liability assumed by the insured under a contract not defined in the policy. Such provisions, which may be referred to as "contractual exclusion clauses," deny the coverage generally assumed by a liability policy in cases in which the insured in a contract with a third party agrees to save harmless or indemnify such third party. *Id.* at 739 (quoting 12 Couch on Insurance § 44A:35 at 55 (2d Ed. 1981)). Accordingly, ACE claims that it has no obligation to defend Hyundai in the *Wheelock* Action, and no obligation to reimburse CMG for defense costs it has allegedly paid to Hyundai in connection with the *Wheelock* Action.

However, because CMG would be liable for the operation of its call centers even absent its agreement with Hyundai, the exclusion does not apply by its terms which provide it does not apply to "liability for damages that the insured would have in the absence of the contract or agreement." (ACE Ex. A, § V.C.1). Specifically, CMG, as the operator of the call centers at issue, is the Doe defendant named in the *Wheelock* action and therefore ACE owes CMG an immediate duty to defend. *Century Surety Co v. Polisso*, 139 Cal. App. 4th 922, 952 (Cal. App. 2006) (where insurer has a "duty to defend

any 'suit' seeking [covered] damages" that the "insured becomes legally obligated to pay," the possibility that the policyholder may become liable for a judgment in the existing suit sufficient to trigger the insurer's duty to defend).

Therefore, the contractual liability exclusion is inapplicable.

## G. Criminal Act Exclusion

The plaintiffs in both underlying actions allege violations of California Penal Code Section 630, *et seq*, which criminalizes recordings made without consent and authorizes fines and jail time for violations. *See* Cal. Pen Code §§ 632(a) and 632.7.[23]  Accordingly, Defendants argue that all of the allegations in the underlying actions constitute "criminal acts" under the California Penal Code and therefore coverage is barred by the Policies' criminal act exclusions.

Defendants' policies bar coverage for "personal and advertising injury" "arising out of a criminal act committed by or at the direction of the insured."   The question, then, is whether the acts for which the underlying plaintiffs seek recompense are

---

[23]  The *Knell* complaint alleges violation of § 632: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, …shall be punished by a fine not exceeding two thousand five hundred dollars, or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment…."  The *Wheelock* complaint relies on § 632.7, which provides the same punishment for recorded cellular phone calls.  The authority for the private rights of action asserted in these suits is Penal Code Section 637.2, which provides that "[a]ny person who has been injured by a violation of this chapter may bring an action against the person who committed the violation."  Therefore, any action brought by a private party under § 637.2 must prove criminal conduct under § 630 *et seq.* to recover.

"criminal." *Allstate Ins. Co. v. Cutcher*, 920 F. Supp. 796, 798 (N.D. Ohio 1996).[24] In

the instant case, Plaintiffs' acts are "defined as criminal" by the California Penal Code.

*Kimmel*, 793 P.2d at 530. A violation of California Penal Code § 632 is a "criminal

offense punishable by fine or imprisonment, or both." *Id.*

Ohio recognizes the enforceability of criminal act exclusions, warning only that

broad exclusions must not be read to exclude coverage for merely negligent acts that have

been criminalized. *Am. Family Mut. Ins. Co. v. Scott*, No. 07-CA-28, 2008 Ohio App.

LEXIS 1589, at *9 (Ohio App. Apr. 18, 2008). Such exclusions preclude coverage for

civil claims premised upon criminal conduct. *See State Farm Fire & Cas. Co. v. Condon*,

839 N.E.2d 464, 468 (Ohio Ct. App. 2005) (where insured was criminally prosecuted for

gross abuse of a corpse, separately-brought civil claims based on same conduct were

barred from coverage by exclusion for "personal injury arising out of the willful violation

of a penal statute."). The exclusion's application does not turn on whether the insured

has been convicted of a crime. *Cutcher*, 920 F. Supp. at 798 (noting that the insured may

not be prosecuted criminally for any number of reasons, but that "do[e]s not remove the

---

[24] In *Cutcher*, the insured argued that because he was a minor and would not be prosecuted criminally for the conduct at issue, the "criminal acts" exclusion did not apply. 920 F. Supp. at 798. The court held that regardless of the offender's age, the Ohio criminal code defines certain crimes and "[t]hose definitions describe the acts which can result in criminal liability." *Id.* Therefore, while "for a variety of reasons, conviction may…be avoided, even though the perpetrator committed the acts defined as criminal by the statute," the exclusion barred coverage for the defined acts. *Id.*

defendant's conduct from the statutory definition [of the crime] as found" in the criminal statute).[25]

The *Knell* action was dismissed without payment because the plaintiff in that case learned that the phone number sued upon was not one of Encore's phone numbers. Nonetheless, ACE has a duty to defend and insure against any suit, even if groundless, false, or fraudulent.  In *Knell,* there was no finding that Encore had committed a criminal act because the case was dismissed without payment.  In fact, Encore never even received a phone call that was alleged to fall within the penal code provision.  Similarly, *Wheelock* may be dismissed for the same or for any other variety of reasons.  There may never be a finding that CMG engaged in a criminal act in the *Wheelock* case.  Accordingly, whether CMG committed a criminal act in *Wheelock* is a disputed issue of fact.  Whether or not the penal code violation that gives rise to civil liability constitutes a criminal act or not is irrelevant at this stage.  The fact that it is an open question renders the criminal act exclusion inapplicable.

---

[25] *See, e.g., Allstate Ins. Co. v. Miller*, 732 F. Supp. 2d 1128, 1141 (D. Hawaii 2010) (addressing "criminal acts" exclusion and finding "[p]olicy's plain language does not require a criminal charge or conviction and coverage is determined through the Underlying Lawsuit's factual allegations").

## V.   CONCLUSION

Accordingly, for the foregoing reasons, Plaintiffs' cross-motion for partial summary judgment (Doc. 66) is **GRANTED,** and, finding that there is no just cause for delay, the Court orders entry of final judgment establishing that ACE has an immediate duty to defend, and pay the costs of defending, Plaintiffs in the *Knell* Action and the *Wheelock* Action.

ACE shall immediately undertake the defense of these potentially covered actions until such time as it is able to establish as a matter of law that there is no possibility of coverage, which showing ACE has not yet achieved in the present case.  *Grange Mut. Cas. Co. v. Rosko*, 767 N.E.2d 1225, 1230 (Ohio App. 2001).  The fact that the insurer may ultimately have a defense to coverage does not relieve it of its obligation to pay defense costs as they are incurred until and unless it can establish the applicability of that defense as a matter of law and fact.  *Motorists Mut. Ins. Co. v. Trainor,* 294 N.E.2d 874, 878 (Ohio 1973).

**IT IS SO ORDERED**.

Date:  7/3/13                                                  *s/ Timothy S. Black*
                                                               Timothy S. Black
                                                               United States District Judge